Ronald E. ROGERS, Plaintiff,

v.

DESA INTERNATIONAL, INC., Home Depot USA, Inc., d/b/a Home Depot, Lowe's Home Centers, Inc. d/b/a Lowe's Home Improvement Warehouse, and Northern Tool & Equipment Company, Inc., Defendants.

No. 00–73986.

United States District Court,
E.D. Michigan,
Southern Division.

Oct. 19, 2001.

OPINION AND ORDER

FEIKENS, District Judge.

## I. INTRODUCTION

Plaintiff Ronald Rogers (Rogers) invented and patented a tree trimming device. This device is essentially a chain saw releasably mounted on the end of a telescoping pole. *See* Patent No. 5,884,403. He is now suing the defendants for patent infringement because the defendants are making and/or selling the Remington Pole Saw (RPS) a chain saw releasably mounted on the end of a telescoping pole.[1] Defendants have moved for summary judgment claiming that the plaintiff's patent is invalid. I heard oral argument on this issue on August 22 and August 27, 2001. For reasons set forth below, I grant defendants' motion for summary judgment on invalidity grounds. Motions on the issue of infringement are accordingly moot and need not be addressed.

## II. BACKGROUND

Plaintiff conceived his idea in 1992. He created a prototype and took preliminary steps toward patenting his invention. Because he used a Remington chain saw in creating his prototype he approached the defendant Desa, producer of the Remington chain saw, for the possibility of licensing his invention to it. In October of 1996 he spoke to Jeff Polofsky at Desa and sent him a videotape of his invention. Though early conversations with Desa led plaintiff to believe that Desa was interested and would send engineers out to look at the invention, Polofsky ultimately told the plaintiff that Desa was not interested. Desa also turned down plaintiff's request to purchase saws from it

Richard W. Hoffman, Warn, Burgess & Hoffman, Auburn Hills, MI, for Plaintiff.

David L. Witcoff, Marc S. Blackman, Stacy A. Baim, Jones, Day, Reavis & Pogue, Chicago, IL, William A. Sankbeil, Kerr, Russell & Weber, Detroit, MI, for Defendants.

1. Plaintiff also sues for trade secret misappropriation under state law which is not at issue in this opinion.

Prior to this interaction, Desa had for decades been working on a similar product. In early January 1998 Desa decided to go ahead with its product. Also in early January 1998, plaintiff filed a provisional patent application. Desa began to market and sell the RPS in 1998. Plaintiff's patent issued on March 23, 1999. On March 30, 1999, plaintiff offered to license his pole saw invention to defendant Desa who again turned him down.

## III. DISCUSSION

### A. STANDARD FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56(c), summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." If the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party" there is no genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In making this determination, "the evidence of the non-movant is believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

### B. CLAIM CONSTRUCTION

■ The first task in any patent case is to construe the claims.[2] In this case, how-

ever, claim construction is not necessary. The defendants raise obviousness as their main argument for invalidity. In doing so, the defendants have conceded the issue of claim construction and adopted plaintiff's claim construction for the purposes of their motion. I recognize that the defendants, in order to protect themselves from a possible finding of nonobviousness (and, therefore, validity), limit this concession to the motion at hand. Defendants do not disagree with the plaintiff's claim construction. However, in view of the teaching of *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,[3] although it does not seem necessary, I make the following claim construction.

■ Claim construction is a question of law that I must resolve. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed.Cir.1995). Some courts conduct *Markman* hearings to determine the proper interpretation of claim language. However, this is not a necessary procedure. *See e.g., Electronic Planroom, Inc. v. McGraw–Hill Companies, Inc.*, 135 F.Supp.2d 805, 832 n. 25 (E.D.Mich.2001)( "[F]or the purposes of the present motions, the claims may be construed by resort to the plain meaning and ordinary understanding of their terms.... Under these circumstances, the Court finds it unnecessary to conduct a separate *Markman* hearing before ruling on the pending motions), *Moll v. Northern Telecom Inc.*, 37 USPQ2d 1839, 1842 (E.D.Pa.1995), *aff'd.* 119 F.3d 17, 1997 WL 394241 (Fed.Cir.1997)(unpublished)(While the *Markman* decision holds that the court,

---

**2.** Defendants have conceded claim construction for the purpose of their motion on invalidity.

**3.** "Conceptually, the first step of an invalidity analysis based on anticipation and/or obviousness in view of prior art references is no different from that of an infringement analysis. 'It is elementary in patent law that, in

determining whether a patent is valid, and, if valid, infringed, the first step is to determine the meaning and scope of each claim in suit.' 'A claim must be construed before determining its validity just as it is first construed before deciding infringement.'" *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (2001).

rather than the jury, should interpret the claims, the opinion does not explicitly prescribe how this should be accomplished.... *Markman* appears to leave a district court with three options: (1) interpret the claims on the paper record, if possible; (2) hold a separate bench trial to resolve the disputes surrounding claim interpretation before trial; or (3) wait until the actual trial and rule on claim interpretation issues just prior to instructing the jury."), *Elf Atochem North America, Inc. v. Libbey–Owens–Ford Co., Inc.,* 894 F.Supp. 844, 850 (D.Del.1995). Given the lack of technical and linguistic complexity and lack of conflicting factual evidence, I find the papers filed are sufficient to construe the claims. Therefore, I find no need to conduct a *Markman* hearing.[4]

The plaintiff asserts that claims 1 and 3 of his patent are infringed; therefore, these are the claims that must be construed. The disputed elements are in bold.

Claim 1 [5] teaches:

An electric telescoping pole saw, comprising:

an electric chain saw having a handle, a trigger, and a power cord;

a telescoping pole assembly having telescoping tubular sections extending between an upper end and a lower end of said pole and including an adjustable coupling clamp operative when loosened to enable said sections to telescope relative to one another for adjusting the effective length of said pole and operative when tightened to secure said sections in a selected position of adjustment;

a **bracket** provided on said upper end of said pole for receiving said handle of said saw and mounting saw releasably

on said pole adjacent said upper end thereof;

a **trigger depression device** operative to support said trigger of said saw in a depressed "on" position;

an adjustable length extension cord accommodated within said telescoping pole having an end extending from said upper end of said pole connectable releasably with said power cord of said saw, and an opposite end extending from said lower end connectable to an electrical power source; and

a **remote switch mounted** on said pole adjacent said lower end thereof and coupled electrically to said extension cord and operative when depressed to transmit electrical power to said saw to operate said saw and operative when released to discontinue power and operation of said saw.

### 1. Bracket

Defendants assert that the purpose of the invention is to cut tree limbs without binding. In order to do this, defendants claim, Rogers invented a bracket to attach the saw to the pole at a specific angle. They posit that, as a matter of law, the bracket must be construed as requiring a 140–160 degree angle and that this is a special definition given by the patentee as his own lexicographer. In support they cite the specification (3:8–12) and Rogers' deposition testimony.

Plaintiff claims that defendants misconstrue the plain language of the claim, asserting ambiguity where none exists. Plaintiff contends that the purpose of the bracket is to enable the saw to be mounted *releasably,* that there is no limitation, either express or implied, regarding the angle of the bracket. Plaintiff argues that

---

4. It should also be noted that none of the parties has requested such a hearing.

5. Claims 1 and 3 contain the same elements and therefore construction of claim 1 is effectively construction of claim 3 and I need not construe them both.

defendants cannot use the specification to circumvent the claim's plain language and inappropriately use extrinsic evidence (i.e., the deposition) where none is required.

■ The detailed description of the bracket is as follows:

The bracket 14 is best shown in FIGS. 13 and comprises a pair of laterally spaced, parallel metal side plates 42 joined along their rearward top edges by a metal cross plate 44. The casing 18 of the saw 12 is received in the space between the plates 42 from below. A bottom guard plate 46, supplied by the saw manufacturer, of the casing 18 extends laterally outwardly of the casing and confronts the lower edge of the side plate 42 when the saw 12 is fully accommodated in the bracket 14.

The guard plate supplied with the saw is trimmed somewhat at the back of the casing to accommodate the handle 16. As shown, the plate 46 is modified to terminate at a rearward edge 48 located forwardly of the handle 16. The saw 12 is otherwise unmodified.

The top plate 44 of the bracket 14 confronts the top surface of the handle 32 of the casing 18 and may be padded to minimize marring of the casing 18. Fasteners 50, 52 extend through associated aligned openings 54, 56 in the side plates 42 and pass through the open handle region 58 of the casing 18. When tightened, the fasteners 50, 52 draw the side plates 42 toward one another and clamp the casing 18 between the side plates 42 to secure the saw 12 in fixed relation to the bracket.

A metal tubular sleeve 60 is suitably fixed, such as by welding, to one of the side plates 42 and is open at its ends to accommodate the upper end of the extension handle 16. Fasteners 62, 64 extend through aligned openings in the sleeve 60 and handle 16 to fix the bracket 14 immovably to the handle 16. As shown best in FIGS. 1 and 2, the sleeve 60 is fixed to the bracket 14 in such relation that the bar 22 of the saw 12 is set at a fixed obtuse angle A (FIG.1) with respect to a longitudinal axis of the handle 16. The angle is in the range of about 140–160 and preferably about 150. This angular relationship between the bar 22 and handle 16 prevents the chain 24 from binding while cutting a tree limb. (Emphasis added).

Though a patent's specification acts as the dictionary for the claim, "[i]t is a fundamental rule of claim construction that '[r]eferences to a preferred embodiment, such as those often present in a specification, are not claim limitations.'" Relume Corp. v. Dialight Corp., 63 F.Supp.2d 788, 796 (1999) quoting Laitram Corp. v. Cambridge Wire Cloth Co., 863 F.2d 855, 865 (Fed.Cir.1988). "Claim 1 only requires its array to incorporate one component: the LEDs. No additional components are therefore necessary. Except for its description of the preferred embodiment of the array, the specification of the '645 patent teaches nothing different. Its statement of the invention's objectives does not mention ballast resistors or claim any functional advantage related to ballast resistors. Perhaps most telling, the preferred embodiment passage relied on by defendants is itself only cursory in its reference to ballast resistors; it does not explain what advantage is to be gained by using them in the array." Id.

In contrast to Relume, the specification describing the preferred embodiment of the Rogers patent does explain what advantage is to be gained by using an obtuse angle: non-binding. This advantage however, is not included in the statement of objectives for the invention. The deposition testimony of the plaintiff does little to clarify this issue. It is clear that the purpose of his invention was to provide a lightweight polesaw to be used by the average homeowner. Non-binding was not

the reason for the invention though it was an additional benefit of the invention.

The question then becomes: would a person of ordinary skill in the art understand the obtuse angle to be a necessary component of a polesaw because without it the polesaw will have a greater tendency to bind? *See id.* at 797. "Because their function is not essential to the claimed array, it follows that ballast resistors themselves are not essential components for that array." *Id.* So, if the angle is not essential to the bracket, the "bracket" of claim 1 does not require an obtuse angle. The angle is not essential to the claim or the invention. It is merely a preferred embodiment. The purpose of the invention is the creation of a polesaw comprised of a chain saw that can be releasably affixed to a telescoping pole assembly, not the creation of a non-binding polesaw. Therefore, the angle is not essential and is not included in the claim construction.

### 2. Trigger Depression Device

Defendants construe the term "trigger depression device" under 35 U.S.C. § 112 ¶ 6 even though the claim does not use the traditional means or step plus function language. They argue that "securing the trigger" is a function and not an act because it describes what that element ac-

complishes but not how the function is accomplished. The method that plaintiff uses for depressing the trigger is a "band or tie encircling the handle and trigger of a saw." Therefore, they claim that under § 112 ¶ 6 "trigger depression device" is defined as "a band or tie encircling the handle and trigger of a saw."

Plaintiff first contends that the trigger depression device ought not be construed under § 112 ¶ 6 because it does not use the "means for" format required. Moreover, he argues that "the trigger depression device is [a] specific structure that is well understood both by laymen and those skilled in the art." The term connotes a generic structure to support the trigger in the "on" position with the preferred structure disclosed in the specification. They argue that the claim language ought not to be narrowed by the single embodiment disclosed in the specification.

Defendants rebut the assertion in plaintiff's brief that a person of ordinary skill in the art would understand the definite structure required by the "trigger depression device" (or "securing the trigger" in claim 3) by arguing that plaintiff's own deposition testimony admits that this phrase has no ordinary meaning in the art. (Citing Rogers Dep. 208:6–209:3, 224:3–13) [6].

---

**6.**  Q. Is trigger depression device a phrase that has ordinary meaning in the field or is that a phrase that was coined for purposes of your patent?

A.  I believe that's a phrase.

Q.  A phrase with meaning in the industry or a phrased [sic] that was coined for purposes of your patent?

A.  I believe it's a phrase in industry—I believe.

Q.  When was the first time you heard the phrase trigger depression device?

A.  I completely understood it the first time I heard it, I mean when the lawyers told me. I mean, I don't know when I heard it in my lifetime. When you say that to

me it means to me something to hold the trigger down.

Q.  I'm not asking you whether it describes the function that it performs, but I take it that you agree that that phrase does describe the function of holding down the power switch, the trigger?

A.  Yes.

Q.  I'm asking you instead whether you had ever heard that phrase before your lawyers mentioned it to you in connection with your patent application.

A.  I really can't answer that, I don't know the answer to it. I don't know if I have heard that in my life or not.

Q.  As you sit here do you recall ever hearing it before your lawyers mentioned it?

■The specification, in regard to the trigger depression device reads:

According to the present invention, the trigger switch 30 is disabled by a lock device 34 such that the circuit remains closed at all times between the cord 26 and motor 20. *FIG. 4 illustrates the preferred way of disabling the switch 30. As shown, a plastic band or tie 34 encircles the handle 32 and trigger 30 to hold the trigger 30 in the fully depressed condition.* The tie 34 may be of the conventional type having a plastic strap 36 anchored at one end to a lock body 38 and having its opposite free end 40 extendible through a slot in the body 38 where it is gripped by a one way locking mechanism to prevent the withdrawal of the free end 40. (Emphasis added.)

"The Federal Circuit has determined that a presumption of section 112, paragraph 6 governance 'can be rebutted if the evidence intrinsic to the patent and any relevant extrinsic evidence so warrant.'" *Relume* 63 F.Supp.2d at 799 quoting *Personalized Media v. Int'l Trade Comm'n*, 161 F.3d 696, 704 (Fed.Cir.1998). "Throughout the rebuttal inquiry, 'the focus remains on whether the claim as properly construed recites sufficiently definite structure....' A claim recites sufficient structure when it elaborates the structure, material, or acts necessary to perform entirely the recited function." *Id.* citing same and also citing *Sage Products, Inc. v. Devon Industries, Inc.*, 126

A. No.
(207:21–209:3)
Q: Is the phrase securing the trigger a phrase that is commonly used in the industry or was that phrase coined for purposes of your patent application?
A. I would say it's used in the industry, some hand drills have them built right in.
Q. When did you first hear the phrase securing the trigger in a tree trimming context?

F.3d 1420, 1427–28 (Fed.Cir.1997). "Close scrutiny of the term 'power factor correction converter means' reveals that it implicitly elaborates sufficient structure to a person of ordinary skill in the art of power supplies." *Id.* In general, if the claim does not include the correct word formulation invoking § 112, the presumption is against the application of this provision. However, this presumption can be rebutted and the invoking words are not necessary. Though the term "device" is a general term, in connection with "trigger depression" and given the prevalence of triggers in the art of trimming devices, as well as the existence of the term in prior art, this term evinces sufficient structure so as not to invoke § 112.

### 3. Remote Switch

Defendants argue that the claim specifies that the remote switch be located on the lower end of the telescoping pole assembly. It cannot, they assert, include a trigger switch mounted on a handle or grip below the pole assembly.

Plaintiff argues that the claim does not require the trigger switch to be attached to the lower telescoping tubular section. Rather, it requires only that the switch be mounted adjacent to the lower end of the pole. Plaintiff argues that as the accused product's grip is part of the pole assembly, a remote trigger on the grip is adjacent to the lower end, as described in the claim.

The specification, in regard to the remote switch, reads:

A. When they wrote the patent of the saw that I designed.
Q. That was the first time you heard the phrase, quote, securing the trigger?
A. On a chain saw it is.
Q. And is that the first time you heard the phrase, quote, securing the trigger in the context of tree trimming?
A. That's the first time I ever heard it.
(223:22–224:13)

*A trigger 106 of the switch 88 extends through an open slot 108 through the lower handle section 68 and is movable from the solid line position to the broken chain line position shown in FIG. 5 for closing the switch and completing the circuit from the external extension cord 94 to the internal extension cord 88 and the motor 20.* (Emphasis added.)

A remote switch is mounted on the handle adjacent its lower end.

Though none of the claim language mentions the existence of a handle or grip on the pole assembly, given the specification, it seems clear that such a handle/grip is contemplated. Moreover, the specification seems to define "adjacent to the lower end" as just such a handle/grip. Therefore, the claim should not be construed to preclude the placement of the remote switch on a handle or grip adjacent to the bottom of the pole assembly. Nor should it require the remote switch to be placed on the pole itself, above a handle/grip.

Claim 3 is a methods claim that is essentially the same as claim 1. It recites the same elements. The parties make the same arguments. Therefore, a separate analysis is not necessary. The claim should be construed in the same way as claim 1 above.

## C. INVALIDITY

■ Once approved by the Patent Office, a patent is presumed valid. However, in a patent infringement case, a defendant may assert a patent's invalidity as a defense to an infringement claim. Under 35 U.S.C. § 103 a patent may be found to be invalid as obvious.[7] A patent is invalidated for obviousness when the invention as a whole would have been obvious to a person of ordinary skill in the art when the invention was patented. *See* 35 U.S.C. § 103, *SIBIA Neurosciences, Inc. v. Cadus Pharmaceutical Corp.*, 225 F.3d 1349 1355 (Fed.Cir.2000); *see, e.g., Richardson–Vicks, Inc. v. Upjohn Co.*, 122 F.3d 1476 (Fed.Cir.1997) (holding patent invalid for obviousness). The defendant must show obviousness by clear and convincing evidence. *Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*, 229 F.3d 1120, 1124 (Fed.Cir.2000). Ultimately this determination is a matter of law. *See Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). It involves, however, several factual issues: 1) the scope and content of the prior art; 2) the differences, if any, between the patented claims and the prior art; 3) the level of ordinary skill in the art; and 4) secondary considerations of non-obviousness. *See Id.*

### 1. Prior Art

■ Defendants' expert, Dr. Clark J. Radcliffe, identifies many patents as prior art upon which defendants rely. The plaintiff does not rely on an expert. Though plaintiff asserts that this is a factual issue, plaintiff has not offered any evidence to dispute Dr. Radcliffe's report. Defendants identify the pertinent art for this analysis as "trimming tools on extension poles." I accept this assertion.

The patents that defendants cite as prior art are many.[8] It is clear that there is no

---

7. The defendants have also asserted that the plaintiff's patent is invalid as anticipated under 35 U.S.C. § 102. I find this argument is without merit. As I also find that the patent is invalid as obvious, I need not delve into an analysis of anticipation.

8. These patents include: Moore No. 4,515,423, Causey No. 4,207,675, Miller No. Re. 34,258, Firman No. 4,733,470, D'Alessandro No. 5,787,590, Yaguchi, 3,688,139, Mathiesen No. 3,731,830, Rice No. 3,949,817, Kolodziejcyzk No. 4,359,822, Wilson No. 4,566,188, Drake No. 4,638,562, Fazar No. 5,001,858, Banta No. 5,070,576, Fox I No. 5,361,851, Caron No. 5,411,238, Fox II No. 5,598,892, Rees No. Des. 361,481.

paucity of similar products in the field. I need not discuss each patent cited by the defendants. Four are sufficient to clearly and convincingly establish that plaintiff's invention would have been obvious not only to a person of ordinary skill in the art but to an ordinary person. These four are Moore, patent no. 4,515,423, Causey, patent no. 4,207,675, Miller, patent no. Re. 34,258, and D'Alessandro patent no. 5,787,-590. Of these four, only Causey was considered by the Patent Office when approving plaintiff's patent.

The Moore patent is "an extension device for use with electrically powered tools such as hedge trimmers to permit their use at an extended distance from the operator." Moore Patent, Abstract. The Moore patent was not considered by the Patent Office when it approved plaintiff's patent. The patent specifically contemplates trimming trees without the use of a step ladder, as does plaintiff's patent. While the specific embodiment of the device describes use with a hedge trimmer, it specifically suggests its use with other hand held trimming tools. "A tool handle gripping cup 18(40) releasably attaches a hedge trimmer 23 or any other lightweight electrically-powered tool, such as an electric chain saw, to an adjustable telescoping pole 15." Expert Report of Dr. Clark J. Radcliffe Regarding United States Patent No. 5,844,403. Like plaintiff's chain saw, this tool can be used independently of the pole. The invention includes a hollow pole through which an adjustable length spiral electrical cord runs. There is a remote switch at the bottom of the pole for remote operation.

Plaintiff points out that the invention does not specifically mention a trigger like the one on plaintiff's releasable chain saw. However, defendants argue that a trigger and therefore a trigger depression device would be obvious to a person of ordinary skill in the art as other hand held devices

are suggested by the Moore patent. Plaintiff also argues that the pole in Moore would not support the weight of a chain saw. However, plaintiff submits no evidence other than his own affidavit to support this assertion.

The Causey patent describes an elongated non-telescoping pole that includes a trigger depression device and is designed for a variety of hand-held electrical trimming tools.

The Miller patent describes a telescoping pole with a hedge trimming apparatus attached. According to the background and summary of the inventions it is "directed to a new and improved apparatus for trimming by hand, hedges, shrubs and/or other trees and foliage utilizing an electric motor powered cutting instrument mounted on a telescopic pole in a manner such that branches, limbs, and the like well above the head and normal reach of the operator of the apparatus may be reached easily and comfortably without need for scaffolding, ladders or other means which must be climbed or ascended by the operator to get access to the growth to be trimmed." Though the cutting apparatus is not releasable from the pole assembly, it does include a switch at the lower end of the pole assembly as well as a coiled cord through the pole.

The D'Alessandro patent "provide[s] an extension rod for a commercially available industrial type of clipper to enable the operator to reach heights beyond his normal reach without having to resort to ladders." The invention utilizes a "shoe" to releasably mount an electric trimming device on a telescoping pole assembly to enable the user to trim high hedges which are normally out of reach. In discussing the background art, the D'Alesaandro patent explains the reason for this invention. "[C]utting hedges, trees or foliage at high heights is a very tedious and tiring opera-

tion. Particularly, when the operator has to reach exceptionally high or has to use a step ladder. Using a step ladder not only requires the constant moving of the ladder, but is particularly strenuous on the legs."

"Before a conclusion of obviousness may be made based on a combination of references, there must have been reason, suggestion, or motivation to lead an inventor to combine those references.... If the invention is different from what is disclosed in one reference, but the differences are such that combination with another reference would lead to what is claimed, the obviousness question then requires inquiry into whether there is reason, suggestion, or motivation to make that combination." *Pro–Mold and Tool Co. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1572 (Fed.Cir.1996). In *Pro–Mold* the court found that the motivation was the size of a sports trading card that would motivate a person of ordinary skill in the art to create a card holder that was no larger than necessary. In the present case, the existence of several devices which allow either for chain saws to be mounted on poles or for lightweight trimming devices to be mounted on telescoping pole assemblies would clearly motivate a person of ordinary skill in the art to releasably mount a chain saw on the end of a telescoping pole. By 1998, the year in which plaintiff submitted his patent application, there were various patents already in existence. Each element contained in plaintiff's patent is contained in one or more of the four other patents I have discussed above. Taken as a group, releasably mounting a light weight chain saw on the end of a telescoping pole assembly to trim trees would be obvious to a person of ordinary skill in the art.

## 2. Objective Indicia of Non–Obviousness

■ Though it is clear from the above examination of prior art that plaintiff's invention was obvious, the inquiry does not end there. The obviousness determination must include an analysis of objective indicia of non-obviousness or secondary considerations. Secondary considerations are, however, "but a part of the 'totality of the evidence' that is used to reach the ultimate conclusion of obviousness" and do not control the obviousness determination. *Richardson–Vicks*, 122 F.3d at 1483. The evidence of secondary considerations must be of sufficient weight to override a determination of obviousness based on primary considerations. *See id., Ryko Mfg. Co. v. Nu–Star, Inc.*, 950 F.2d 714, 719 (Fed.Cir. 1991). The plaintiff argues that the following secondary considerations exist such to preclude a grant of summary judgment on the matter of obviousness: copying, long-felt need, and commercial success. The strongest, though ultimately unpersuasive, of these is commercial success.

Plaintiff points out that Desa, the manufacturer of the accused product, has enjoyed commercial success that far exceeds its projected number of sales. Desa projected that sales of its product, the Remington Pole Saw, would be approximately 46,800 polesaws per year. From February of 1998 through June 2001 Desa sold 428,-583. This is approximately two and a half times their projected sales undeniably indicating the commercial success of the accused product.

■ In order for commercial success to rebut the compelling evidence of obviousness, plaintiff must establish a factual nexus between the features of the claimed invention and its commercial success. "Such a nexus is required to prove that the commercial success is not ascribable to other irrelevant commercial and economic factors." *Ryko* 950 F.2d at 719. In most cases in which commercial success is a factor precluding the finding of summary judgment for invalidity, the

plaintiff has also marketed his or her own invention. Plaintiff argues that the accused product embodies the claimed features and is coextensive with them. According to the Federal Circuit, "[I]f the marketed product embodies claimed features, and is coextensive with them, then a nexus is presumed and the burden shifts to the party asserting obviousness to present evidence to rebut the presumed nexus." *Brown & Williamson*, 229 F.3d at 1130. Certainly, without delving into a determination of the infringement issue, on the face of it, the accused product does embody the features of the patented invention and is coextensive with them. Like the patented invention, the accused product has a chain saw, releasably mounted on the end of a telescoping pole assembly which includes a bracket which also serves as a trigger depression device, a coiled electrical cord within the pole and a remote switch mounted at the bottom of the pole assembly. Of course defendants assert the plaintiff has not shown this nexus and merely relies on his briefs submitted on the infringement issue. Moreover, they assert that there are various factors to which the commercial success of their product is attributable. They point out that millions of dollars have been spent in advertising, that the brand name "Remington" is recognized as a leader in the chain saw industry, the product is sold by well-respected retailers and therefore enjoys an implied endorsement of quality. They also point out that the retailers of the accused product have experienced rapid growth with an increased number of stores and therefore sales of the accused product have grown in line with the retailers' own expansion.

Regardless of other factors, commercial success is always at least in part due to the features of the product. However, even were I to assume that plaintiff has shown commercial success, which is not rebutted by the defendants, the weight of this secondary consideration can not and does not negate the overwhelming evidence of obviousness as shown by the prior art. Plaintiff has provided no evidence that creates a genuine issue of material fact which would preclude a finding of summary judgment for the defendants. "[T]he record...establishes such a strong case of obviousness based on...the teachings of the prior art, including...a reference not considered during examination, that the objective evidence of nonobviousness does not persuade us to reach a contrary conclusion." *Newell Companies, Inc. v. Kenney Manufacturing Co.*, 864 F.2d 757, 769 (Fed.Cir.1988).

The ultimate determination of obviousness is a matter of law. "[W]e have held that where the ultimate legal conclusion of obviousness is disputed, but not the underlying facts, there is no issue of fact requiring a trial, even though some facts favor obviousness, some nonobviousness. This is so even in a case where a jury is demanded because it is not the function of the jury to pick and choose among *established facts* relating to obviousness in contrast to its obligation to sift through *conflicting evidence* and determine what those facts are." *Id.* at 763. (Emphasis in original.) There is no conflicting evidence here. Even resolving all evidence and justifiable inferences in favor of the plaintiff, the secondary consideration of commercial success does not carry weight sufficient to outweigh the clear and convincing evidence of obviousness. *See Ryko*, 950 F.2d at 719. Therefore, I find that the plaintiff's patent is invalid as obvious.

## IV. CONCLUSION

Having found that the plaintiff's patented product would have been obvious to a person of ordinary skill in the art and that it is therefore invalid, I grant defendants' motion for summary judgment of invalidity. Moreover, as I find the patent invalid,

the claim of infringement is now moot and therefore dismissed.